**E. G. ROBINSON, Jr., t/a Palmetto Broadcasting Company (WDKD), Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**No. 17587.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 19, 1963.

Decided March 19, 1964.

Petition for Rehearing En Banc Denied May 7, 1964.

Petition for Rehearing by the Division Denied May 11, 1964.

Certiorari Denied Oct. 12, 1964. See 85 S.Ct. 84.

Mr. Vernon L. Wilkinson, Washington, D. C., with whom Mr. James A. McKenna, Jr., Washington, D. C., was on the brief, for appellant. Mr. Harry J. Daly and Mrs. Lenore G. Ehrig, Washington, D. C., also entered appearances for appellant.

Mr. Daniel R. Ohlbaum, Associate Gen. Counsel, Federal Communications Commission, with whom Mr. Max D. Paglin, Gen. Counsel, and Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Harry M. Plotkin, Washington, D. C., for American Civil Liberties Union, as amicus curiae.

Before BAZELON, Chief Judge, and WILBUR K. MILLER and WASHINGTON, Circuit Judges.

PER CURIAM:

Edward G. Robinson, Jr., challenges the Federal Communications Commission's denial of his applications for renewal of the license of radio station

WDKD, located in Kingstree, South Carolina, and for a construction permit to change the station's antenna system.

These are the relevant circumstances. On May 11, 1960, the Commission sent Robinson the following letter:

This is with reference to certain complaints received by the Commission concerning certain program material broadcast by your station, with particular reference to the Charlie Walker programs.

It is alleged in substance that said programs are vulgar and suggestive, and are susceptible of double meanings with indecent connotations. The tape recordings of some of your programs are in the possession of the Commission.

It is the practice of the Commission to associate complaints with the files of the stations involved and afford the licensees an opportunity to submit a statement with respect thereto. Accordingly, this matter is being brought to your attention.

In light of the foregoing, it is requested that a statement be submitted by you with respect to this matter within 15 days from the date of this letter.

On June 10, after the Commission allowed Robinson's counsel to hear certain of the tape recordings, Robinson replied to the Commission, in pertinent part:

* * * These statements made by my employee, Charlie Walker, were not known to me, and I cannot help but agree that they are suggestive and, in some cases, of a vulgar nature. As a result of this information and in line with my avowed policy of maintaining a clean and decent Radio Station, I have unconditionally released Charlie Walker from my employ as of the date of this letter.

I want to stress to you the fact that I was not acquainted with the nature of the statements made by Charlie Walker and the show on the air at my Radio Station, and I can assure you that the only accusation which could be leveled at me is that perhaps I should have followed these matters more closely and should have known exactly what was going on. * * *

Thereafter, the Commission designated the matter for hearing upon the following issues:

1. To determine whether in its written or oral statements to the Commission with respect to the above matters, the licensee misrepresented facts to the Commission and/or was lacking in candor;

2. To determine whether the licensee maintained adequate control or supervision of programming material broadcast over his station during the period of his most recent license renewal;

3. To determine whether the licensee permitting programming material to be broadcast over Station WDKD on the Charlie Walker show, particularly during the period between January 1, 1960 and April 30, 1960, which program material was coarse, vulgar, suggestive, and susceptible of indecent, double meaning;

4. To determine the manner in which the programming broadcast by the licensee during the period of his most recent license renewal has met the needs of the areas and populations served by the station;

5. To determine whether, in light of the evidence adduced with respect to the foregoing issues, the licensee possesses the requisite qualifications to be a licensee of the Commission;

6. To determine whether, in light of the evidence adduced with respect to the foregoing issues, a grant of the above-captioned applications would serve the public interest, convenience or necessity.

At hearings held in Kingstree on May 31, June 1, 2, and 5, 1961, Robinson testified that with a few insignificant exceptions he had never heard Walker broadcast objectionable material, and emphasized that he had never heard complaints about such material. Numerous other

witnesses, however, testified they had made such complaints to Robinson.

On the basis of his findings adverse to Robinson on the first four issues, the Examiner concluded that Robinson did not possess the requisite qualifications to be a licensee of the Commission, and that a grant of the applications would not serve the public interest, convenience, or necessity. He proposed the applications be denied.

On appeal the Commission affirmed the Examiner's findings but modified his conclusions of law. Thus, although the Commission in answering issues Nos. 5 and 6 in the negative found against Robinson on all of the first four issues, it held that the finding on either issue No. 1 or No. 3, standing alone, would support denial. In regard to issue No. 1, the Commission said, "We find that in the circumstances of this case, the licensee's misrepresentations and false statements, *in and of themselves,* constitute grounds for denial of WDKD's application for renewal of license." We agree that this provides sufficient support for the Commission's decision. Accordingly we reach no other questions.

 In determining whether the grant of an application for license renewal will serve the "public interest, convenience, and necessity," 47 U.S.C. § 307 (d), the Commission has a duty to consider the performance of the applicant in meeting the needs of the community. In discharging this duty in the present case, the Commission properly sought information concerning the applicant's broadcast material which had been the subject of complaints received by the Commission. Robinson's representations to the Commission that he lacked knowledge of the situation were contradicted by many witnesses. The record amply supports the Examiner's action in crediting the opposing witnesses and refusing to credit Robinson, and in concluding as a result that Robinson was guilty of misrepresentations.

 We intimate no views on whether the Commission could have denied the applications if Robinson had been truthful. "The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones." Federal Communications Comm'n v. WOKO, 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946). We hold only that Robinson's willingness to deceive the Commission justified its conclusion that he did not possess the requisite qualifications to be a licensee and that a grant of his applications would not serve the public interest. Federal Communications Comm'n v. WOKO, *supra.*

Affirmed.

WILBUR K. MILLER, Circuit Judge (concurring).

I agree with the holding of the foregoing opinion that the Commission's refusal to renew the license of the Kingstree station should be affirmed because it found under issue No. 1 that Robinson made misrepresentations and false statements, but I think the opinion does not go far enough.

The Kingstree radio station was established in 1949 with the appellant and Marion L. Few as equal partners. During the succeeding seven years, Few received complaints about Charlie Walker's programs which he said he passed on to Robinson. Finally, in 1956 Few discharged Walker because of his broadcasts, but Robinson promptly reinstated him. Because of this, Few severed his connection with the station. This is convincing evidence, not mentioned in the majority opinion, that Robinson deliberately falsified when he said he knew nothing of the contents of Walker's programs, and furnishes strong additional support for the Commission's conclusion under issue No. 1.

Samples of his broadcasts are in the record. They constitute, I think, plain violations of the statute which denounces as criminal the uttering of obscene, indecent or profane language by means of

radio communication.[1] (I understand that in December, 1963, a federal district court found Charlie Walker guilty of violating this statute in his broadcasts over Robinson's radio station.) It is almost incredible that a licensee would permit such vulgar and indecent programs to emanate from his station, but the fact that Robinson knowingly did so is, I think, amply demonstrated in the record. Whether or not this fact justifies charging Robinson personally with violating § 1464, it demonstrates at the very least the soundness of the Commission's conclusion under issue No. 2 that he did not exercise adequate control or supervision of programming material broadcast over his station.

Robinson's guilt under issue No. 3, as found by the Commission, seems to me to be apparent from the record, and it goes without saying that the Commission was correct in finding, under issue No. 4, that the station's Charlie Walker programs did not meet the needs of the areas and populations served by the station. No area or population needs a radio program which violates the criminal statute to which I have referred.

These fully justified conclusions of the Commission under issues Nos. 2, 3 and 4 should have been examined and upheld by the majority, and assigned as additional reasons for affirming the Commission's action in refusing to renew Robinson's license. In my view, the industry and the public are entitled to know the full story, so it will be generally understood that such conduct will not be tolerated.

Perhaps the majority refrained from discussing the other issues because of a desire to avoid approving any Commission action which might be called program censorship. I do not think that denying renewal of a license because of the station's broadcast of obscene, indecent or profane language—a serious criminal offense—can properly be called program censorship.[2] But, if it can be so denominated, then I think censorship to that extent is not only permissible but required in the public interest. Freedom of speech does not legalize using the public airways to peddle filth.

On Petition for Rehearing *En Banc*

Before BAZELON, Chief Judge, and WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges, in Chambers.

ORDER

PER CURIAM.

On consideration of appellant's petition for rehearing *en banc*, it is

ORDERED by the court *en banc* that the petition is hereby denied.

WRIGHT, Circuit Judge (concurring).

In his petition for rehearing *en banc*, appellant seeks to raise again the issue of censorship of program content by Government officials. He argues:

"A majority of the present Supreme Court has made it clear that any examination into 'program content' by an administrative agency functioning under a broad 'public interest' or 'general welfare' stand-

---

1. Section 1464 of Title 18 is as follows:
 "Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both. June 25, 1948, c. 645, 62 Stat. 769."

2. In KFKB Broadcasting Ass'n v. Federal Radio Commission, 60 App.D.C. 79, 47 F.2d 670 (1931), we said:
 "Appellant contends that the attitude of the commission amounts to a censorship of the station contrary to the provisions of section 29 of the Radio Act of 1927 (47 USCA § 109). This contention is without merit. There has been no attempt on the part of the commission to subject any part of appellant's broadcasting matter to scrutiny prior to its release. In considering the question whether the public interest, convenience, or necessity will be served by a renewal of appellant's license, the commission has merely exercised its undoubted right to take note of appellant's past conduct, which is not censorship."

ard contravenes First Amendment freedoms. Where administrative agencies, in the exercise of their licensing functions, 'judge the content of the words and pictures to be communicated', the safeguards of the First and Fourteenth Amendments become applicable save in the exceptional case. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502 [72 S.Ct. 777, 96 L.Ed. 1098] (1952). A violation of the First Amendment arises where a government agency 'undertakes to censor the contents of the broadcasting'. Kovacs v. Cooper, 336 U.S. 77, 97 [69 S.Ct. 448, 93 L.Ed. 513] (1949) (Jackson, J. concurring). '*Any* examination of thought or expression in order to prevent publication of "objectionable material"' is censorship. Farmers Educational [and Co-op] Union [of America, North Dakota Division] v. WDAY, Inc., 360 U.S. 525, 527 [79 S.Ct. 1302, 3 L.Ed.2d 1407] (1960) (emphasis by the Court). * * *

"[Additionally], a basic concept runs throughout recent Supreme Court decisions to the effect that, since First Amendment freedoms need breathing space to survive, the government may regulate in this area 'only with narrow specificity'. NAACP v. Button, 31 Law Week, 4063, 4067 [371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405] (1963); cf. New York Times Co. v. Sullivan, 32 Law Week 4184 [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686] (1964); Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 2 L.Ed.2d 1460] (1958). Accordingly 'stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech'. Smith v. California, 361 U.S. 147, 151 [80 S.Ct. 215, 4 L.Ed. 2d 205] (1959). * * *

" * * * [See also Joseph Burstyn, Inc. v. Wilson, *supra;* Staub v. [City of] Baxley, 355 U.S. 313 [78 S.Ct. 277, 2 L.Ed.2d 302] (1958);] Butler v. Michigan, 352 U.S. 380, 383 [77 S.Ct. 524, 1 L.Ed. 2d 412] (1957); Bantam Books, Inc. v. Sullivan, 31 Law Week 4194, 4194–4196 [372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584] (U.S.Sup.Ct. 1963)."

Most important, appellant suggests that the absence of a ruling from this court on the Commission's powers of program review will be understood by the broadcasting industry as an endorsement of Commission censorship. A prediction of a law review writer is quoted:

" * * * The court of appeals, in reviewing [*Robinson*], may uphold the Commission's action on some of the alternative grounds of decision. In this event, the limits on FCC authority will remain unclear, and its action in [*Robinson*] may prove a successful feint of regulation, whereby the FCC can affect program content even when it may not actually have authority to do so. * * * "

77 HARV.L.REV. 713 (1964).

I do not read the decision of this court to endorse program content regulation. See 48 Stat. 1091, 62 Stat. 682, 47 U.S.C. § 326. The opinion stated, "We intimate no views on whether the Commission could have denied the applications if Robinson had been truthful." (pp. 536) The concurring judge noted: "Perhaps as the majority refrained from discussing the other issues because of a desire to avoid approving any Commission action which might be called program censorship." (pp. 537)

If the Commission were likely to undertake such program content review, *en banc* consideration would be justified. But this does not seem likely, for the Commission seems to recognize the First Amendment, statutory, and policy bases for protection of programming from the Government censor. Subsequent to its action in the matter under review, the Commission announced:

"We recognize that * * * provocative programming * * * may offend some listeners. But this does

not mean that those offended have the right, through the Commission's licensing power, to rule such programming off the airwaves. Were this the case, only the wholly inoffensive, the bland, could gain access to the radio microphone or TV camera. No such drastic curtailment can be countenanced under the Constitution, the Communications Act, or the Commission's policy, which has consistently sought to insure 'the maintenance of radio and television as a medium of freedom of speech and freedom of expression for the people of the Nation as a whole' (*Editorializing Report*, 13 F.C.C. 1246, 1248). In saying this, we do not mean to indicate that those who have complained about the foregoing programs are in the wrong as to the worth of these programs and should listen to them. This is a matter solely for determination by the individual listeners. Our function, we stress, is not to pass on the merits of the program—to commend or to frown. * * *

\* \* \* \* \* \*

" * * * [W]e are charged under the Act with 'promoting the larger and more effective use of radio in the public interest' (Section 303(g)), and obviously, in the discharge of that responsibility, must take every precaution to avoid inhibiting broadcast licensees' efforts at experimenting or diversifying their programming. Such diversity of programming has been the goal of many Commission policies (e.g., multiple ownership, development of UHF, the fairness doctrine). Clearly, the Commission must remain faithful to that goal in discharging its functions in the actual area of programming itself."

In re Applications of Pacifica Foundation, FCC 64–43, No. 45386, pp. 3–5.

I see no need now to decide whether this statement exhausts the constitutional protection of free speech in broadcasting, or whether the Commission, in the quoted case and in the case before us, correctly applied the constitutional guarantees. It is enough now for me that the Commission realizes the vital importance of preserving both free speech and an atmosphere of freedom in these communications media. For this reason, I do not feel that an *en banc* consideration of this case is necessary.